**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA

    v.

RICHARD GRAHAM FOOTE
O'DONOGHUE (also known as GRAHAM
O'DONOGHUE),

      Defendant.

Criminal No.  24-cr-566 (CKK)

---

**MEMORANDUM OPINION & ORDER**
(October 6, 2025)

Defendant Richard Graham Foote O'Donoghue seeks an order modifying his conditions of release to allow him to travel to the United Kingdom between October 9, 2025, and November 15, 2025.  Def.'s Mot., ECF No. 39.  The Government opposes this request, arguing that Mr. O'Donoghue's existing conditions are appropriate and well-tailored to the facts and circumstances of Mr. O'Donoghue's case.  Gov't Opp'n, ECF No. 41.  After reviewing the record and the arguments presented by the parties, the Court shall **DENY** Mr. O'Donoghue's motion to modify his conditions of release.

**I. BACKGROUND**

Mr. O'Donoghue is released on conditions pending trial on charges of tax evasion, subscribing to false tax returns, and making false statements to federal agents.  *See* Indictment, ECF No. 1.  The Government alleges that Mr. O'Donoghue, who is a U.S. citizen, engaged in this unlawful conduct between the years of 2012 and 2023 while living and working abroad.  *See id*. Specifically, the Government alleges that Mr. O'Donoghue failed to fully report his taxable income between the years of 2012 and 2015, made false statements to a tax preparer that caused false

1

information to be conveyed to the IRS in 2016, and made false statements to federal agents during a 2023 interview regarding an investigation into his tax returns.  *See id.*

A grand jury indicted Mr. O'Donoghue on December 12, 2024.  *See* Indictment, ECF No. 1.  Mr. O'Donoghue was arrested on May 9, 2025, in Boston, Massachusetts, "after re-entering the United States for the first time after his indictment."  Gov't's Opp'n, ECF No. 41 at 4.  Mr. O'Donoghue's passport was seized upon arrest.  *Id*.  On May 12, 2025, Mr. O'Donoghue was released subject to conditions pending trial.  *See* Order Setting Conditions of Release, ECF No. 19.

Mr. O'Donoghue's conditions of pretrial release require that Mr. O'Donoghue surrender his passport and seek approval from the Court for any travel outside the Continental United States.  *Id*.  Shortly after Mr. O'Donoghue was released subject to these conditions, counsel for Mr. O'Donoghue and the Government began discussing a combination of conditions that would allow Mr. O'Donoghue to return to the United Kingdom.  *See* Def.'s Mot., ECF No. 39 at 3 (explaining that, in late May 2025, the Government contacted the Clerk's Office to facilitate a $1.2 million secured bond and expressed confidence in reaching a combination of conditions that would allow Mr. O'Donoghue to return to the U.K.); Gov't's Opp'n, ECF No. 41 at 4–5.  However, on May 28, 2025, the Government informed counsel for Mr. O'Donoghue that, after consulting with DOJ's Office of International Affairs, law enforcement, and Pretrial Services, it opposed modifying Mr. O'Donoghue's conditions to allow him to return to the U.K. due to an inability to monitor Mr. O'Donoghue in the U.K. and enforce his conditions of release.  *Id*.; Gov't's Opp'n, ECF No. 41 at 4–5.

On September 5, 2025, Mr. O'Donoghue moved the Court to modify his conditions of release to "allow him to travel to the United Kingdom . . . between October 9, 2025, and November

15, 2025, absent any intervening Court date." Def.'s Mot., ECF No. 39 at 1. Mr. O'Donoghue proposes the following conditions to allow him to travel to the U.K.:

- ❖ A $1.2 million secured appearance bond, collateralized by his father's assets.
- ❖ Travel restricted to the United Kingdom.
- ❖ Surrender of his U.S. passport within 12 hours of arrival in the UK to the London office of K&L Gates LLP, the law firm representing Mr. O'Donoghue in this matter.
- ❖ Surrender of his Swiss work permit to defense counsel in Washington, D.C., before departing for the UK.
- ❖ Weekly in-person check-in appointments at K&L Gates's London office, or with staff at the U.S. Embassy in London, if preferred.
- ❖ Execution of an irrevocable waiver of extradition.
- ❖ Written commitment to return to the United States at least 48 hours before any status conference or other Court appearance.

*Id.* at 3–4. The Government opposes Mr. O'Donoghue's proposed modifications. *See* Gov't's Opp'n, ECF No. 41.

## II. LEGAL STANDARD

Following an order setting the conditions of release for a pretrial defendant, the Court "may at any time amend the order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3). "Under the Bail Reform Act, a defendant must be released pretrial 'subject to the least restrictive . . . condition, or combination of conditions, that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." *United States v. Irizarry*, No. 22-3028, 2022 WL 2284298, at *1 (D.C. Cir. June 24, 2022) (quoting 18 U.S.C. § 3142(c)(1)(B)). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

"A determination that an individual is a flight risk must be supported by a preponderance of the evidence." *Vasquez-Benitez*, 919 F.3d at 551. Such a determination must be based on "an

individualized assessment of safety concerns or flight risks" rather than "global judgments." *Irizarry*, 2022 WL 2284298, at *1. Furthermore, pretrial conditions should not be imposed to preemptively punish a defendant who is presumed innocent until proven guilty. *See Bell v. Wolfish*, 441 U.S. 520, 535, 539 (1979).

### III. ANALYSIS

Mr. O'Donoghue moves the Court to modify his pretrial conditions of release to allow him to travel to the United Kingdom between October 9, 2025, and November 15, 2025. Def.'s Mot., ECF No. 39 at 1. The Government opposes this travel on the basis that Mr. O'Donoghue is a flight risk. *See* Gov't's Opp'n, ECF No. 41. Mr. O'Donoghue argues that the Government "has failed to meet its burden of proof to show that [he] is a flight risk such that the proposed modified conditions cannot be approved by the Court." Def.'s Reply, ECF No. 43 at 2. To settle this dispute, the Court considers the extent to which Mr. O'Donoghue presents a flight risk under the Bail Reform Act and the effectiveness of Mr. O'Donoghue's proposed conditions in mitigating any risk of flight. Based on these considerations, the Court shall DENY Mr. O'Donoghue's proposed modifications.

### A. The Bail Reform Act Factors

The Bail Reform Act provides "four factors a court must consider to determine whether an individual is a flight risk." *Vasquez-Benitez*, 919 F.3d at 550. Those factors are: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person;" and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id*. at 550–51 (quoting 18 U.S.C. § 3142(g)). Through these four factors—some of which carry more weight in

this context than others—the Government has established that Mr. O'Donoghue poses a risk of flight.

### 1. The Nature and Circumstances of the Charged Offenses

In some cases, the first two factors under the Bail Reform Act "have little bearing" on whether a pretrial defendant presents a flight risk. *See United States v. Cattani*, No. 23-MJ-243-ZMF, 2024 WL 4188657, at *1 (D.D.C. Sept. 13, 2024) (quoting *United States v. Purse*, No. CR 21-0512 (PLF), 2022 WL 17264634, at *2 (D.D.C. Nov. 29, 2022)). However, as this Court has explained, when a defendant "has been indicted for making false statements to the United States" and the Government alleges that there is "substantial evidence" against the Defendant, "the nature and circumstances of the offenses charged, as well as the weight of the evidence against [the defendant], [may] suggest that a condition allowing [the defendant] to travel [abroad] would not reasonably assure the appearance of [the defendant] as required." *United States v. Viau*, No. CR 19-09 (CKK), 2019 WL 3412920, at *3 (D.D.C. July 29, 2019).

Mr. O'Donoghue argues that the nature and circumstances of the charges against him weigh in favor of modifying his conditions of release to allow him to travel and live in the U.K. for a little over a month. Mr. O'Donoghue's primary argument under this first factor is that the charges against him "are serious but non-violent." Def.'s Mot., ECF No. 39 at 6. "As serious as the charges are," Mr. O'Donoghue argues, they are not so serious as to cause him to "consider embracing the life of a fugitive exile to avoid the consequences of a potential conviction at trial." *Id.*

The Government responds by emphasizing that the charges against Mr. O'Donoghue "involve repeated false statements to multiple parties, including the U.S. government." Gov't's Opp'n, ECF No. 41 at 6. Specifically, Mr. O'Donoghue is charged with "various tax crimes for having provided false information" and with "making false statements to U.S. authorities in an

attempt to thwart investigation into his wrongdoing." *Id*. If convicted of these charges, Mr. O'Donoghue would face "significant time" in prison along with "other potential consequences," such as the "suspension or revocation of his [New York] bar license." *Id*. The Government argues that these consequences provide Mr. O'Donoghue with "significant incentives to flee." *Id*. at 6–7.

The Court determines that the nature and circumstances of the charges against Mr. O'Donoghue weigh against modifying his conditions of release to allow him to travel to the U.K. To start, the Government argues that Mr. O'Donoghue poses a risk of flight, not a danger to the community, so the "non-violent" nature of the charges does minimal work for Mr. O'Donoghue. *See* Def.'s Mot., ECF No. 39 at 6 (". . . the government has never suggested that Mr. O'Donoghue poses a danger to the community."). And to the extent Mr. O'Donoghue attempts to use violence as a measuring stick for whether an offense is "serious," the Court notes that "the seriousness of the offenses is not a relevant consideration for [determining] flight risk," either. *Cattani*, 2024 WL 4188657, at *2 (citing *Purse*, 2022 WL 17264634, at *2). What the Court *does* find relevant to Mr. O'Donoghue's risk of flight, however, is the location of the alleged tax violations and the circumstances surrounding Mr. O'Donoghue's alleged false statements to federal agents. Given that the charges against Mr. O'Donoghue relate to conduct that occurred over an extended period of time while Mr. O'Donoghue was living and working abroad, the Court hesitates to allow Mr. O'Donoghue to return to living and working abroad without adequate supervision. Furthermore, Mr. O'Donoghue does not dispute that he holds a Swiss work permit and works for a company that has offices in Switzerland, and the Government has raised a reasonable risk of flight by showing that Mr. O'Donoghue could work in Switzerland, which does not extradite for tax crimes, even after giving up his Swiss work permit. Finally, while Mr. O'Donoghue was well within his rights

to appeal to the U.K.'s Crown Court to stop U.S. authorities from requesting information against him, the circumstances surrounding Mr. O'Donoghue's allegedly false statements to U.S. investigators shows that Mr. O'Donoghue took active steps to stymie U.S. law enforcement and employed foreign legal process to that end, which only adds to his risk of flight. Gov't Opp'n, ECF No. 41 at 3.

While "the presumption of innocence is not suspended when determining conditions of pretrial release," *Cattani*, 2024 WL 4188657, at *2, the Government has sufficiently established that the nature and circumstances surrounding its charges against Mr. O'Donoghue weigh against permitting Mr. O'Donoghue to travel to the U.K. without adequate supervision.

### 2. The Weight of the Evidence

Mr. O'Donoghue claims that the weight of the evidence favors granting his proposed modification. He argues that the Government's case against him is "an atypical tax fraud prosecution, with an alleged loss amount far below the usual threshold for prosecution." Def.'s Mot., ECF No. 39 at 6. Furthermore, Mr. O'Donoghue argues that the Government "has not shown sufficient evidence of willfulness [on his part] to evade tax." *Id*. Accordingly, Mr. O'Donoghue concludes, "nothing in the record suggests [that he] has sought or would seek to evade prosecution based on the government's evidence." *Id*.

The Government disagrees with both of Mr. O'Donoghue's arguments regarding the weight of the evidence. The Government argues that this is not an "atypical" prosecution for a minor amount of money "[g]iven that [Mr. O'Donoghue] is alleged to have concealed more than $1 million of income[] and caused a loss of more than $400,000." Gov't Opp'n, ECF No. 41 at 8. Furthermore, the Government points out that Mr. O'Donoghue "is one of several Company-1 executives prosecuted for concealing income from Company-1 in order to avoid U.S. taxes." *Id*.

(citing *United States v. Charles Squires*, 22-cr-21 (CKK) (unreported income of $1,824,867; tax loss of $666,080), *United States v. James Robar*, 22-cr-72 (CKK) (unreported income of $5,557,500; tax loss of $1,593,191); *United States v. Ronald Thomas*, 22-cr-101 (CKK) (unreported income of $870,267; tax loss of $227,539); *United States v. Zachary Friedman*, 22-cr-263 (CKK) (unreported income of $531,097; tax loss of $207,106)).  In addition, the Government provides evidence to counter Mr. O'Donoghue's claim that the Government "has not shown sufficient evidence of willfulness," Def.'s Mot., ECF No. 39 at 6.  For instance, the Government argues that Mr. O'Donoghue, "a highly educated lawyer and executive with white collar defense experience," provided his tax preparer with "detailed spreadsheets of his income and expenses" that reported his expenses "down to the cent" while underreporting his income "by hundreds of thousands of dollars."  Gov't Opp'n, ECF No. 41 at 7.  In addition, the Government has provided evidence to suggest that Mr. O'Donoghue downplayed his role at Company-1 to his tax preparer by telling his tax preparer that he was the "general manager" rather than the "Group President & CEO."  *See* Gov't Sur-Reply Ex. A, ECF No. 47-1.  Finally, the Government states that it recently provided a reverse proffer to Mr. O'Donoghue that "detail[s] the case and the evidence" against Mr. O'Donoghue, including "a 293-page document with details about [Mr. O'Donoghue's] unreported income, and a summary chart of the individual amounts [Mr. O'Donoghue] received each year."  *Id*. at 8.

Without passing judgment on the ultimate force of the evidence provided by the Government, the Court determines that, at this stage, the weight of the evidence against Mr. O'Donoghue supports the Government's opposition to modifying Mr. O'Donoghue's conditions of release.  In addition to the evidence provided by the Government, the Court notes that Mr. O'Donoghue himself has admitted to law enforcement "that the income reported on his 2012 to

2015 tax returns was incorrect and did not reflect the income he had actually received in those years." Indictment ¶ 18. Furthermore, the Court must respect the fact that "a grand jury has found probable cause to conclude that [Mr. O'Donoghue] engaged in the criminal activity of which he is accused." *Viau*, 2019 WL 3412920, at *3. This leads the Court to conclude that, while the weight of the evidence might not lean strongly in favor of prohibiting Mr. O'Donoghue from traveling to the U.K., it certainly does not lean in favor of permitting such travel.

### 3. History and Characteristics of the Defendant

In determining whether a pretrial defendant poses a flight risk, courts primarily focus on the history and characteristics of the defendant. *See Cattani*, 2024 WL 4188657, at *1 (citing *Purse*, 2022 WL 17264634, at *2)). This factor includes "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." *Vasquez-Benitez*, 919 F.3d 546, 550–51 (quoting 18 U.S.C. § 3142(g)).

Mr. O'Donoghue argues that this factor "strongly favors modification of [his] conditions." Def.'s Mot., ECF No. 39 at 7. He emphasizes that his U.S. citizenship is his sole citizenship, and that he "has significant ties to the United States and deep family and community ties to the Washington area." *Id*. Furthermore, Mr. O'Donoghue argues that he "has no prior criminal history" and that he has fully complied with every condition of his pretrial release and "maintained prompt and regular communication with Pretrial Services." *Id*.

The Government has a different view, arguing that Mr. O'Donoghue's "history in this case shows a pattern of misleading courts, law enforcement, and the Probation Office." Gov't's Opp'n, ECF No. 41 at 9. The Government emphasizes that this history "weighs heavily against [Mr.

O'Donoghue] returning to the United Kingdom on his own recognizance, especially considering that the government and Court have no ability to monitor or act outside the United States." *Id*. at 10. The Government also introduces evidence that draws into question the declaration Mr. O'Donoghue submitted to the Court in support of his motion to modify his conditions. In response to the Government's claim that Mr. O'Donoghue refused to provide a probation officer with his cell phone number while being processed after his arrest, Gov't Opp'n, ECF No. 41 at 9, Mr. O'Donoghue submitted a declaration where he attested that he "never told the probation officer that [he] could not remember [his] own cell phone number" and that he "only told the probation officer that [he] could not recall [his] father's cell phone number from memory." Ex. A to Def.'s Reply, ECF No. 43-1 ¶ 6. However, the Government has introduced a contemporaneous email from the probation officer who interviewed Mr. O'Donoghue where the probation officer, after explaining to the on-duty AUSA that Mr. O'Donoghue could not remember his father's cell phone number, asks the on-duty AUSA, "Can you see if the agent have [sic] [Mr. O'Donoghue's] cell number because [Mr. O'Donoghue] couldn't recall that either?" Ex. B to Gov't Sur-Reply, ECF No. 47-2. The Government argues that this discrepancy is "relevant to the Court's decision" given the "numerous other factual representations made in [Mr. O'Donoghue's] declaration" and because "several of [Mr. O'Donoghue's] proposed conditions [that accompany his request for modification] involve promises by [Mr. O'Donoghue]." Gov't Sur-Reply, ECF No. 47 at 4.

At the outset, the Court agrees with the Government that the discrepancies between Mr. O'Donoghue's declaration and the email from the probation officer that interviewed Mr. O'Donoghue are relevant to Mr. O'Donoghue's request to travel to the U.K. In the Court's view, the consideration of Mr. O'Donoghue's "history and characteristics" under the Bail Reform Act involves a consideration of trust. Perhaps the discrepancy between Mr. O'Donoghue's declaration

and the contemporaneous email from the probation officer is simply a misunderstanding.  That is

the best-case-scenario.  But even in that scenario, the Court cannot ignore the degree to which Mr.

O'Donoghue, a sophisticated lawyer and executive, expressed with certainty that he did not refuse

to give the interviewing probation officer his cell phone number when, according to the

Government's evidence, that was simply not true.[1]  *See* O'Donoghue Declaration, ECF 43-1 ¶ 6

("I never told the probation officer that I could not remember my own cell phone number."); Def.'s

Reply, ECF 43 at 8-9 (arguing that the assertion that he couldn't recall his cell phone number was

"false and absurd").  Nor can the Court ignore the way in which this discrepancy mirrors the

discrepancies alleged in the Government's indictment of Mr. O'Donoghue.  *See, e.g.,* Indictment

¶ 13 (alleging that O'Donoghue provided false information to his tax preparer); *Id.* ¶ 16 (alleging

that O'Donoghue made false statements to federal officials during an interview conducted pursuant

to an agreement that "provided that [O'Donoghue's] truthfulness was an express material condition

of the agreement"); *id.* ¶ 18 (alleging that O'Donoghue admitted that the information he provided

to his tax preparer was false, but that it was "merely a mistake").  While Mr. O'Donoghue is

presumed innocent of these charges, the Court finds these charges—along with the evidence the

Government has provided to support them—to shed meaningful light on the puzzling discrepancy

between Mr. O'Donoghue's declaration and the Government's evidence.

     The above discussion informs the Court's view of Mr. O'Donoghue's "character," which

the Court must consider under the Bail Reform Act.  18 U.S.C. § 3142(g).  It also informs the

Court's view of Mr. O'Donoghue's compliance with his pretrial conditions of release.  The

Government alleges that, after his initial appearance, Mr. O'Donoghue did not report to his

---

[1] Mr. O'Donoghue of course had the right to remain silent.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  But he does not argue that he was exercising that right.

probation officer as directed until the Government intervened with Mr. O'Donoghue's counsel. Gov't's Opp'n, ECF No. 41 at 4. Mr. O'Donoghue explains this as a misunderstanding. Def.'s Reply, ECF No. 43 at 9. The Government also alleges that, after he was released on conditions, Mr. O'Donoghue "requested access to his passport for the stated purpose of obtaining a driver's license" even though "a passport is unnecessary to obtain a driver's license." Gov't's Opp'n, ECF No. 41 at 4. Mr. O'Donoghue explains that he requested his passport because it was less burdensome than getting a copy of his birth certificate. Def.'s Reply, ECF No. 43 at 9–10. In light of the evidence the Government has introduced, these issues support the Government's concerns over Mr. O'Donoghue's compliance with his pretrial conditions of release.

Finally, while the Court does not question Mr. O'Donoghue's claim that he "has significant ties to the United States and deep family and community ties to the Washington area," Def.'s Mot., ECF No. 39 at 7, the Court must also consider the fact that Mr. O'Donoghue has significant ties abroad, both in terms of his "family" and "employment," 18 U.S.C. § 3142(g). Indeed, this present case arose out of his employment ties abroad, and the Government has provided evidence that Mr. O'Donoghue was involved with a circle of individuals who have also been indicted for violating U.S. law. *See* Gov't's Opp'n, ECF No. 41 at 8 (citing cases in which other executives from Company-1 were prosecuted for tax evasion). Furthermore, Mr. O'Donoghue has not disputed the Government's evidence showing that Mr. O'Donoghue has a Swiss work permit and is employed by a company with offices in Switzerland, a country that does not extradite for tax crimes. Gov't's Opp'n, ECF No. 41 at 2. The Government has also presented evidence that Mr. O'Donoghue may have gained significant "financial resources," 18 U.S.C. § 3142(g), as a result of his charged conduct. Taken together, these circumstances sufficiently demonstrate that Mr. O'Donoghue has the "ability not only to flee the United States but also to live comfortably and evade capture in

foreign jurisdictions." *United States v. Hong Vo*, 978 F. Supp. 2d 41, 45 (D.D.C. 2013) (cleaned up).

All things considered, the Court determines that the history and characteristics of Mr. O'Donoghue weigh in favor of finding that he poses a risk of flight.

### 4. Nature and Seriousness of the Danger to Any Person in the Community

As O'Donoghue argues, the Government "does not allege, and no evidence suggests, that Mr. O'Donoghue poses any danger to the community." Def.'s Mot., ECF No. 39 at 7. Accordingly, this factor is not relevant to the Court's determination of whether Mr. O'Donoghue poses a flight risk.

\*      \*      \*      \*

After weighing the above four factors, the Court determines that the Government has introduced sufficient evidence to support a finding that Mr. O'Donoghue would be a flight risk if he were allowed to travel to the U.K. for over a month. Accordingly, the Court must consider whether Mr. O'Donoghue's proposed conditions that accompany his request to travel to the U.K. are sufficient to eliminate the Government's reasonable concerns about securing his appearance.

### B. Whether O'Donoghue's Proposed Conditions Eliminate Concerns About His Appearance

As detailed above, the Government has proven by a preponderance of the evidence that Mr. O'Donoghue poses a flight risk under his proposed modifications to his pretrial conditions of release. *See Vasquez-Benitez*, 919 F.3d at 551. However, given that Mr. O'Donoghue "must be released pretrial 'subject to the least restrictive . . . condition, or combination of conditions, that . . . will reasonably assure [his] appearance [] as required,'" the Court must consider whether Mr. O'Donoghue's proposed conditions will "reasonably assure [his] appearance" despite the

Government's demonstrated risk of flight. *Irizarry*, 2022 WL 2284298, at *1 (quoting 18 U.S.C.

§ 3142(c)(1)(B)).

Mr. O'Donoghue argues that the following conditions are sufficient to mitigate against any

risk of flight he may pose:

- ❖ A $1.2 million secured appearance bond, collateralized by his father's assets.
- ❖ Travel restricted to the United Kingdom.
- ❖ Surrender of his U.S. passport within 12 hours of arrival in the UK to the London office of K&L Gates LLP, the law firm representing Mr. O'Donoghue in this matter.
- ❖ Surrender of his Swiss work permit to defense counsel in Washington, D.C., before departing for the UK.
- ❖ Weekly in-person check-in appointments at K&L Gates's London office, or with staff at the U.S. Embassy in London, if preferred.
- ❖ Execution of an irrevocable waiver of extradition.
- ❖ Written commitment to return to the United States at least 48 hours before any status conference or other Court appearance.

Def.'s Mot., ECF No. 39 at 3–4. In addition, Mr. O'Donoghue adds that "[i]f the Court seeks even

more assurance, [he] will also accept a nonstop-flight-only condition and seven-day advance

itinerary submission." Def.'s Reply, ECF No. 43 at 5. Mr. O'Donoghue argues that his proposed

conditions "eliminate practical avenues for onward travel from the United Kingdom and create

substantial financial and legal consequences for noncompliance." Def.'s Mot., ECF No. 39 at 8.

Much of Mr. O'Donoghue's argument is done by analogy. Mr. O'Donoghue identifies

"numerous examples . . . of courts allowing defendants to travel abroad while awaiting trial" and

argues that the Government "does not even attempt to engage with" these examples. Def.'s Reply,

ECF No. 43 at 1. Mr. O'Donoghue specifically highlights *United States v. Viau*, No. CR 19-09

(CKK), 2019 WL 3412920 (D.D.C. July 29, 2019), and *United States v. Cattani*, No. 23-MJ-243-

ZMF, 2024 WL 4188657 (D.D.C. Sept. 13, 2024), arguing that his proposed conditions are "stricter

than those imposed in [these cases]." Def.'s Mot., ECF No. 39 at 8. Mr. O'Donoghue is correct

insofar as he identifies a failure by the Government to engage with the case law. But that does not mean that the case law automatically supports Mr. O'Donoghue—as Mr. O'Donoghue points out, the Court "must base [its] release determinations on individualized findings, not categorical assumptions." Def.'s Mot., ECF No. 39 at 4 (citing *Irizarry*, 2022 WL 2284298, at *1–*2; *United States v. Munchel*, 991 F.3d 1273, 1283–84 (D.C. Cir. 2021)). And the two cases that Mr. O'Donoghue singles out—*Viau* and *Cattani*—involved materially different findings than the findings that apply to Mr. O'Donoghue.

First, regarding *United States v. Viau*, the international travel permitted by this Court was travel that the Government did not oppose. No. CR 19-09 (CKK), 2019 WL 3412920 at *1. Here, the Government opposes the international travel requested by Mr. O'Donoghue. The Court finds this distinction significant because the Government and its agents—including Pretrial Services and the DOJ Office of International Affairs—have made individualized determinations regarding the risk posed by Mr. O'Donoghue's travel. Gov't's Opp'n, ECF No. 41 at 4–5. Furthermore, at the time of the defendant's motion in *Viau*, the defendant's conditions of pretrial release already allowed him to live and travel abroad. *Id*. at *1. Mr. O'Donoghue's conditions of pretrial release, in contrast, require that he reside in the Washington Metropolitan Area. *See* Order Setting Conditions of Release, ECF No. 19. Finally, in *Viau*, this Court denied the defendant's request to travel to China because the defendant's "business ties to China" raised a risk of flight. *Viau* at *3. The Court makes a similar finding here with respect to Mr. O'Donoghue's business ties to Switzerland.

Regarding *United States v. Cattani*, the Court determines that the individualized considerations pertaining to Mr. O'Donoghue are entirely different from the individualized considerations that applied to the defendant in *Cattani*. No. 23-MJ-243-ZMF, 2024 WL 4188657.

To start, the defendant in *Cattani* requested permission to travel to Mexico (where he did not have ties, unlike Mr. O'Donoghue's ties to the U.K. and surrounding countries) for one week (which is much shorter than Mr. O'Donoghue's request of over a month) to attend a "personal workshop" (which was a specific event, unlike Mr. O'Donoghue's request). *Id*. at *1; *see also id.* ("Courts also consider the likelihood of flight in the context of travel destination and whether the government opposes the motion to permit international travel."). Furthermore, while the court in *Cattani* noted that Mexico did not appear to "pose unique obstacles to extradition," *id*. at *2, here, the Government has raised legitimate concerns over Mr. O'Donoghue entering Switzerland, which does pose concerns with extradition, Gov't's Sur-Reply, ECF No. 47 at 3. Finally, in *Cattani*, the "government [did] not provide facts [to] indicate [that the defendant] pose[d] a flight risk," which led the court to determine that "the government [sought] to punish [the defendant] *pre-trial*." *Cattani* at *2 (noting that pretrial punishment had become "a repeated theme from the government") (emphasis in original). That is not the case here: as discussed above, the Government has provided evidence that establishes Mr. O'Donoghue poses a risk of flight, and there is nothing to indicate that the Government is trying to punish Mr. O'Donoghue pre-trial.

While the individualized nature of the Court's inquiry would prevent Mr. O'Donoghue from relying on precedent alone to support his request for international travel, the precedent Mr. O'Donoghue cites does not persuade the Court that his proposed conditions are sufficient to reasonably assure his appearance. The Government, in consultation with the DOJ Office of International Affairs, law enforcement, and Pretrial Services, has concluded that Mr. O'Donoghue cannot be sufficiently monitored while abroad and that the Government would have no authority to enforce Mr. O'Donoghue's conditions even if it could monitor him abroad. Gov't's Opp'n, ECF

No. 41 at 4–5.[2]  This means that the Government and the Court would have to take Mr. O'Donoghue at his word when it comes to his compliance with his proposed conditions, and the Government has introduced sufficient evidence to undercut the reasonableness of that proposition. Furthermore, Mr. O'Donoghue's proposal for "[w]eekly in-person check-in appointments" with either the London office of his retained law firm or the U.S. Embassy in London does not constitute a workable substitute for his current check-ins with Pretrial Services, as his law firm would face a conflict if it ever needed to report Mr. O'Donoghue for violating his conditions of release and the Embassy is unlikely to take on that responsibility.  Finally, the Government has demonstrated that Mr. O'Donoghue's proposed surrender of his Swiss work permit would not prevent Mr. O'Donoghue from entering Switzerland, which does not extradite to the United States for "fiscal crimes," including tax crimes.  Gov't's Sur-Reply, ECF No. 47 at 3.

Taken together, neither precedent nor the conditions proposed by Mr. O'Donoghue are sufficient to mitigate against the flight risk he would pose if permitted to travel unmonitored to the U.K.

## IV. CONCLUSION

The Government has met its burden in showing that Mr. O'Donoghue presents a flight risk and that his proposed conditions do not sufficiently mitigate his risk of flight.  Mr. O'Donoghue is a sophisticated lawyer and business executive who has, in the simplest terms, been charged with defrauding the United States.  While Mr. O'Donoghue is presumed innocent of these charges until

---

[2] While Mr. O'Donoghue is "not currently subject to real-time, continuous monitoring in the United States" under his current conditions of release, Def.'s Mot., ECF No. 39 at 8, his current conditions of release provide other conditions that are meaningful and would be absent if Mr. O'Donoghue were permitted to travel to the U.K.  For instance, under his current conditions of release, Mr. O'Donoghue is subject to the third-party supervision of his father and does not have access to his passport.

proven guilty, the Government has provided evidence of Mr. O'Donoghue's conduct outside of the charged conduct that casts doubt upon the ability to reasonably assure his appearance if he is permitted to travel to the U.K. for an extended period without adequate monitoring. Specifically, Mr. O'Donoghue's contention that he did not refuse to provide his cell phone number to the probation officer processing his arrest is belied by a contemporaneous email from that same probation officer. In addition, the Government introduced evidence to show that Mr. O'Donoghue's offer to surrender his Swiss work permit would not be a barrier to Mr. O'Donoghue entering Switzerland, a fact which Mr. O'Donoghue previously (and erroneously) characterized as speculation. Furthermore, Switzerland—a country where Mr. O'Donoghue has "traveled frequently," Gov't Opp'n, ECF No. 41 at 2, and presumably has some work connection given his possession of a Swiss work permit—does not extradite for "fiscal crimes," including tax crimes.

In light of the evidence, the Court concludes that allowing Mr. O'Donoghue to travel to the U.K. subject only to his own monitoring and the monitoring of his retained law firm presents too great of a flight risk. Accordingly, the Court shall **DENY** Mr. O'Donoghue's [39] motion to modify his conditions of release.

**SO ORDERED.**

**Dated:**    October 6, 2025

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge